UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| MEDPACE, INC. | : | Case No. 1:13-cv-784 |
| Plaintiff, | : | Judge Timothy S. Black |
| vs. | : | |
| DARWIN SELECT INSURANCE CO., | : | |
| Defendant. | : | |

**ORDER: (1) DENYING DEFENDANT'S MOTION FOR JUDGMENT ON THE PLEADINGS (Doc. 16); AND (2) GRANTING PLAINTIFF'S MOTION FOR JUDGMENT ON THE PLEADINGS (Doc. 17)**

This civil action is before the Court on the parties' cross-motions for judgment on the pleadings (Doc. 16, 17) and responsive memoranda (Docs. 17, 18).[1]

### I. BACKGROUND FACTS

This case arises out of Darwin's refusal to defend and indemnify its insured, Medpace, in the Underlying Lawsuit.[2] In the Underlying Lawsuit, Defendant Biothera asserted a counterclaim against Medpace for conversion of certain data and information which Medpace generated and prepared (collectively, the "Trial Property") for Biothera under a Master Services Agreement ("MSA") between those two parties. (Doc. 3 at ¶ 4).

---

[1] Medpace's opposition, which was filed on February 28, 2014, was styled as an "Opposition and Cross-Motion for Judgment on the Pleadings." (Doc. 17). However, motions directed at the pleadings were to be filed by February 17, 2014. (Doc. 15). Accordingly, Darwin argues that Medpace's cross-motion was not timely filed. This Court agrees. However, this Court prefers to decide cases on their merits and not upon procedural defaults, and, accordingly, will consider Medpace's cross-motion. *Foman v. Davis*, 371 U.S. 178 (1962).

[2] The Underlying Lawsuit is currently pending before this Court. *See Medpace, Inc. v. Biothera, Inc.*, 1:12-cv-179 (S.D. Ohio).

Medpace tendered the counterclaim to Darwin for defense and indemnification pursuant to a Clinical Research Professional Liability Insurance Policy that Darwin had issued to Medpace (the "Policy"). (*Id.* at ¶ 3). Darwin refused to defend or indemnify Medpace, claiming that the undefined term "research activities" in the Policy does not include a claim based on Medpace's alleged wrongful refusal to turn over the Trial Property to Biothera. (*Id.* at ¶ 5).

### A. The Policy

Darwin issued Clinical Research Professional Liability Insurance Policy No. 0307-1632 to Medpace for the policy period from December 3, 2011 to December 3, 2012. (Doc. 3 at ¶ 3). In relevant part, the Policy states:

> I. INSURING AGREEMENTS
>
> A. CLINICAL RESEARCH PROFESSIONAL LIABILITY COVERAGE
>
> The **Insurer** will pay on behalf of the **Insured**, and subject to the Limit of Liability set forth in ITEM 3(a) of the Declarations, **Loss** and **Defense Expenses** in excess of the Retention stated in ITEM 4(a) of the Declarations which the **Insured** becomes legally obligated to pay as a result of a Claim for an act, error or omission by the **Insured** committed on or after the Retroactive Date in the **Insured's** rendering of or failure to render **Research-Related Services**, provided always that such **Claim** is first made against the **Insured** and reported to the **Insurer** during the **Policy Period** or any applicable Extended Reporting Period. . . .
>
> **III. DEFINITIONS**
> . . .
>
> B. "**Research-Related Services**" means the following, when conducted by an **Insured** on behalf of the **Named Insured**: research activities, or consulting or advisory services performed for third parties for a fee or other consideration, in the fields of biomedical, behavioral, or veterinary research that is conducted in

2

accordance with formal written protocols or procedures and is part of a controlled and regulated research study.

(Doc. 12-1 at §§ I.A and III.BB).

### B. The Claim

The Underlying Lawsuit arises out of a MSA between Medpace and Biothera pursuant to which Medpace agreed to perform certain clinical trial and research activities for Biothera. (Doc. 16 at 3). On February 29, 2012, Biothera terminated the Master Services Agreement. (*Id.*) On March 2, 2012, Medpace initiated the Underlying Lawsuit, alleging breach of contract and unjust enrichment based on Biothera's refusal to pay the money it owed Medpace under the MSA and the related Task Orders and Consulting Agreement. (*Id.*) Biothera filed a counterclaim for conversion, which alleged that: (1) Biothera owns the Trial Property generated by Medpace under the MSA; (2) Medpace had the Trial Property in its custody, control, and possession; and (3) Medpace refused Biothera's request to turn over the Trial Property. (Doc. 3 at ¶ 4).

Darwin argues that the Underlying Conversion Count has nothing to do with Medpace's rendering or failing to render professional services. Rather, it is about Medpace's alleged wrongful conduct in attempting to force a former client into paying its fees, following the termination of its professional relationship with that client. Darwin claims that the Policy does not afford coverage for such a claim. Specifically, Darwin argues that the Underlying Conversion Count arises out of alleged conduct by Medpace committed after it had been removed from managing the Imprime clinical drug trials, at a

3

point in time when Medpace necessarily had ceased rendering or failing to render any "research activities…performed for [Biothera] for a fee." (Doc. 12-1 at § III.BB).

## II. STANDARD OF REVIEW

The standard of review for a Rule 12(c) motion is the same as for a motion under Rule 12(b)(6) for failure to state a claim upon which relief can be granted. *Fritz v. Charter Twp. of Comstock*, 592 F.3d 718, 722 (6th Cir. 2010). "For purposes of a motion for judgment on the pleadings, all well-pleaded material allegations of the pleadings of the opposing party must be taken as true, and the motion may be granted only if the moving party is nevertheless clearly entitled to judgment." *Id.* (*citing JPMorgan Chase Bank v. Winget*, 510 F.3d 577, 581 (6th Cir. 2007)).

## III. ANALYSIS

### A. Interpretation of Insurance Policies

The interpretation of an insurance contract is a question of law for the Court. *Skinner v. Guarantee Trust Life Ins. Co.*, 813 F. Supp. 2d 865, 868 (S.D. Ohio 2011). A court construing insurance policies "must enforce the contract as written and give the words their plain and ordinary meaning." *Cincinnati Indem. Co. v Martin*, 710 N.E.2d 677, 679 (Ohio 1999). Where the provisions of an insurance policy are clear and unambiguous, courts may not rewrite the contract to expand coverage beyond that agreed to by the parties. *Gomolka v. State Auto. Mut. Ins. Co.*, 436 N.E.2d 1347, 1348 (Ohio 1982). Furthermore, any ambiguities in insurance policies are "interpreted against the insurer and in favor of the insured." *Skinner*, 813 F. Supp. 2d at 868.

The party seeking to recover under an insurance policy bears the burden of establishing that the particular loss falls within the policy's insuring agreement. *State Farm Fire & Cas. Co. v. Hiermer*, 720 F. Supp. 1310, 1314 (S.D. Ohio 1988), *aff'd* 884 F.2d 580 (6th Cir. 1989). It is well-settled law in Ohio that "where a term in an insurance contract is not defined by the policy, the term is to be given its ordinary meaning." *Morner v. Giuliano*, 857 N.E.2d 602, 607 (Ohio App. 2006). Similarly, "[u]nder black letter Ohio law, an undefined exclusionary term must be narrowly construed against the insurer." *Encore Receivable Mgmt., Inc. v. Ace Property & Cas. Ins. Co.*, No. 1:12cv297, 2013 U.S. Dist. LEXIS 93513, at *38 (S.D. Ohio July 3, 2013).

### B. Duty to Defend

An insurance company must pay for the defense of actions brought against its insured as long as the underlying complaint contains at least one potentially covered claim.

> An insurer's duty to defend is broader than and distinct from its duty to indemnify. The scope of the allegations in the complaint against the insured determines whether an insurance company has a duty to defend the insured. The insurer must defend the insured in an action when the allegations state a claim that potentially or arguably falls within the liability insurance coverage.

*Ohio Gov't Risk Mgmt. Plan v. Harrison*, 874 N.E.2d 1155, 1160 (Ohio 2007).

Ohio follows the "one claim – all claims" rule. That is, when a complaint against an insured asserts several claims for relief, some – but not all – of which are potentially covered under the terms and conditions of the insurance policy, the insurer is

5

contractually obligated to defend the insured against all claims in the lawsuit, regardless of the ultimate outcome of the lawsuit or the insurer's ultimate liability to the insured. *Sharonville v. Am. Employees Ins. Co.*, 846 N.E.2d 833, 837 (Ohio 2006).

As long as the conversion claim against Medpace is potentially covered by the Policy, it is entitled to a defense unless Darwin can demonstrate that there is no factual or legal basis whatsoever for such coverage.

> To prevail on the issue of the duty to defend, the insured must prove the existence of a potential for coverage, while the insurer must establish the absence of any such potential.  In other words, the insured need only show that the underlying claim may fall within policy coverage; the insurer must prove it cannot.  Facts merely tending to show that the claim is not covered, or may not be covered, but are insufficient to eliminate the possibility that resultant damages (or the nature of the action) will fall within the scope of coverage, therefore add no weight to the scales.  Any seeming disparity in the respective burdens merely reflects the substantive law…Imposition of an immediate duty to defend is necessary to afford the insured what it is entitled to: the full protection of a defense on its behalf.  Hence, once the insured establishes the potential of coverage, the insurer must defend the suit unless it conclusively refutes such potential.

*Brush Wellman, Inc. v. Certain Underwriters at Lloyds*, No. 03-CVH-089, 2006 Ohio Misc. LEXIS 387, at *81-82 (Ohio Ct. of Common Pleas Aug. 30, 2006) (emphasis supplied).  In other words, the fact an insurer may ultimately have a defense to coverage does not relieve it of its obligation to pay defense costs until and unless it can establish the applicability of that defense as a matter of law and fact. *Harrison*, 874 N.E.2d at 1161.

6

### C. Research Related Services

Medpace maintains that it is entitled to defense and indemnification of Biothera's conversion counterclaim, because Medpace's allegedly wrongful refusal to turn over the Trial Property to Biothera fits squarely within the scope of the Policy, and, in particular, within the definition of "Research-Related Services." Darwin maintains that the conversion claim is excluded because it arose *after* Biothera purported to terminate the MSA. The Policy states:

> Loss and Defense Expenses…which the Insured becomes legally obligated to pay as a result of a Claim for an act, error or omission by the Insured committed on or after the Retroactive date in the Insured's rendering of or failure to render Research-Related Services.

(Doc. 12-1 at § I.A).[3] Darwin claims that Medpace's post-contract failure to return the Trial Property and Clinical Materials to their rightful owner was not committed in the rendering of, or failure to render, research related services, so Medpace could not have been performing any services "for a fee" or "as part of a controlled and regulated research study," as is required to constitute research-related services.

However, there is no requirement in the Policy that a claim must arise during the performance of Research-Related Services. The Policy's insuring agreement only requires that the claim must be for "the Insured's rendering of or failure to render

---

[3] The phrase "rendering of or failure to render" is not defined in the Policy. As a result, it must be given its plain and ordinary meaning. *Skinner*, 813 F. Supp.2d at 869. Darwin argues that the "rendering of, or failure to render" language is intended to address a situation where a client pays the insured professional to render certain services, and the insured fails to do so. However, if that was in fact what the language was intended to address, the plain language of the contract should have so stated.

7

Research-Related Services." The fact that Medpace had ceased performing services for Biothera at the time the conversion claim arose is irrelevant, since there is no time limitation in the Policy other than that the error must have been "committed on or after the Retroactive Date[.]" *Id.*[4] Darwin's position suggests that Medpace loses its insurance coverage if, for whatever reason, Medpace suspends or stops providing research-related services to one of its clients. However, this argument has no support in the Policy. Moreover, even though the contractual duties may have been suspended, Medpace had an ongoing legal duty to turn over the Trial Property which survived the termination of the MSA.

Darwin also contends that the conversion claim did not arise out of the performance of Research-Related Services, and, therefore, is not covered by the Policy. However, there is no requirement in the Policy that a claim must arise during the *performance* of Research-Related Services. The policy's insuring agreement only requires that the claim must be for "the Insured's rendering of or failure to render Research-Related Services." (Doc. 12-1 at § I.A). In other words, Biothera's conversion claim is not predicated on Medpace's breach of the MSA, but on the alleged violation of its separate obligation to render the Trial Property to Biothera – which is precisely among the acts, errors, and omissions the Policy insures.

---

[4] If Darwin had intended to provide coverage only for claims which arose while its insured was performing Research-Related Services, Darwin could easily have done so; instead, Darwin chose to use the undefined word "render." (*Id.*)

8

Accordingly, construing the ambiguities against the insurer, the Court concludes that the "failure to render Research-Related Services" includes Medpace's failure to deliver the clinical trial data to Biothera.

**D. Professional Services**

Next, Darwin argues that the name of the Policy ("Clinical Research Professional Liability Insurance Policy") establishes that it is a professional liability policy. Darwin argues that Medpace effectively seeks to transform the Policy into a generalized liability coverage that applies anytime Medpace is alleged to have breached any duty.

While the Policy contains the label "Professional Liability," because the Policy does not expressly state that coverage is limited to acts, errors, or omissions by Medpace in its "professional capacity" as a Clinical Research Organization, the professional liability cases cited by Darwin are inapposite.[5] Relatedly, Clinical Research Organizations are not licensed professionals in the same way that lawyers and accountants are, so the term research-related services cannot be interpreted similarly to the phrases "legal services" and "accounting services."

---

[5] In the cases Darwin cites, the insurance policies specifically defined the term "professional services" and contained an explicit requirement that the claim arise from the insured's activities performed in its professional capacity. Unlike the insurers in those cases, Darwin did not limit coverage under the Policy to Medpace's provision of professional services. For example, in *Davis & Meyer Law, Ltd. v. ProNational Ins. Co.*, the policy defined "professional services" in relevant part as: "services rendered by an Insured in a lawyer-client relationship as a lawyer, mediator, arbitrator, notary public, administrator, conservator, receiver, executor, guardian, trustee, or in any similar fiduciary capacity." No. 06AP-730, 2007 Ohio App. LEXIS 3240, at *11 (Ohio App. July 12, 2007).

**E. Fee Clause**

The Underlying Conversion Count arises out of an ongoing billing dispute between Biothera and Medpace about the fees charged for its services. Accordingly, Darwin argues that given Ohio law interpreting the scope of coverage available under professional liability policies, steps that an insured takes to secure compensation cannot constitute Research-Related Services.[6] (Doc. 12-1 at § I.A).

First, this Court has found, as discussed *supra* at Section III.D, that a professional liability policy is not at issue. In this case, the conversion counterclaim arose out of Medpace's alleged "rendering of or failure to render Research-Related Services." If Darwin wanted to limit the Policy to only provide coverage for claims "during the performance of Research-Related Services," "[i]nvolving negligen[ce] in managing the [clinical] trials," or "arising out of erroneous advice" provided by Medpace, Darwin could have done so. Darwin cannot now rewrite the Policy to contain new terms and conditions. *Neal-Pettit v. Lahman*, No. 91551, 2008 Ohio App. LEXIS 5547, at *3 (Ohio App. Dec. 18, 2008) ("Had [the Insurer] intended otherwise, the policy language could easily have been drafted to reflect that intention.").

Second, most of the cases Darwin relies on contained explicit exclusionary clauses relating to legal fees. Darwin could have excluded fee disputes from coverage in the Policy, as the insurers did in the cases Darwin cites, but it chose not to do so. (Doc. 17 at

---

[6] An insured's fee dispute with its client is not "the same as rendering 'professional services'" and is not "part of the coverage" contemplated by a professional liability policy. *Nat'l Union Fire Ins. Co. of Pittsburg, Pa., v. Shane & Shane Co., L.P.A.*, 605 N.E.2d 1325, 1329 (Ohio App. 1992).

10

9). This deliberate choice is significant because "[w]here exceptions, qualifications or exemptions are introduced into an insurance contract, a general presumption arises to the effect that that which is not clearly excluded from the operation of such contract is included in the operation thereof." *ACE European Group, Ltd. v. Abercrombie & Fitch Co*., No. 2:12cv1214, 2013 U.S. Dist. LEXIS 131269, at *19-20 (S.D. Ohio Sept. 13, 2013). Since Darwin did not explicitly exclude claims relating to billing or fee disputes, such claims are covered by the Policy.

### F. Indemnification

Darwin's duty to indemnify is not yet ripe for determination, because the Underlying Conversion Count has not been fully adjudicated. *See, e.g., Chemstress Consultant Co. v. Cincinnati Ins. Co*., 715 N.E.2d 208, 212 (Ohio App. 1998) (explaining that, because "[a]n insurer's duty to indemnify is separate and distinct from its duty to defend," the lower court erred by deciding the issue of indemnification based solely on the allegations in the underlying complaint).[7] "Although a duty to defend was correctly determined from the allegations in the complaint, determining that there is also a duty to indemnify requires additional information. *Id.* The duty to indemnify is based on whether there is, in fact, liability under the policy. *Id.* The trial court could not make a

---

[7] *See also AMCO Ins. Co. v. Lauren-Spencer, Inc*., 500 F. Supp. 2d 721, 736 (S.D. Ohio 2007) (noting that "the ultimate realization" of an insurer's duty to indemnify "depends on disposition of the underlying litigation").

11

determination without some proof of the actual facts underlying the complaint. *Id.*[8]

## IV. CONCLUSION

Accordingly, for these reasons:

(1) Plaintiff's motion for judgment on the pleadings (Doc. 17) is **GRANTED**, but for the issue of indemnification, which is not yet ripe for determination. Specifically, the Court determines, as a matter of law, that Darwin has a duty to defend Medpace in connection with the Underlying Conversion Count ; and

(2) Defendant's motion for judgment on the pleadings (Doc. 16) is **DENIED**.

**IT IS SO ORDERED**.

Date: 3/31/14                                            *s/ Timothy S. Black*
                                                                                        Timothy S. Black
                                                                                        United States District Judge

---

[8] *See also Erie Ins. Exch. v. Colony Dev. Corp.*, 736 N.E.2d 941, 946 (Ohio App. 1999) ("once a duty to defend is recognized, speculation about the insurer's ultimate obligation to indemnify is premature until facts excluding coverage are revealed during the defense of the litigation.").